# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| ROBERT MCGHEE, and KORONDA SMITH, | CIVIL ACTION FILE |
| Plaintiffs, | NO. _____ |
| v. | |
| CITY OF ATLANTA, ERIK CLANTON, and JAMES DOUGLAS, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

This is a constitutional rights case about the City of Atlanta's unlawful arrest quota policy that places the highest bounties on the heads of Atlanta's children. In this case, the City of Atlanta's policy caused Defendants Clanton and Douglas to initiate the unlawful arrest of Robert McGhee, a minor, who Defendants knew had committed no crime. McGhee initially resisted Defendants' unlawful seizure by fleeing and climbing a fence, but he then stopped to surrender when he realized he could not escape. Defendant Clanton then deliberately pushed McGhee off the top of the fence causing him to fall approximately thirty feet down to the side of an interstate access road. McGhee suffered severe and life-altering injuries as a result of Defendants' unlawful conduct.

## PARTIES

1. Robert McGhee is a young man who is a resident of this district and division. At the time of the events giving rise to this lawsuit, he was a minor on winter break from high school.

2. Koronda Smith is Robert's mother and a resident of this district and division. She brings this action to recover medical bills incurred as a result of Defendants' wrongful conduct before McGhee reached the age of majority.

3. Defendant City of Atlanta is a Georgia municipality subject to suit.

4. Erik Clanton is a law enforcement officer with the Atlanta Police Department sued in his individual capacity. At all times relevant to the complaint, Clanton acted under the color of law.

5. James Douglas is a law enforcement officer with the Atlanta Police Department sued in his individual capacity. At all times relevant to the complaint, Douglas acted under the color of law.

## JURISDICTION AND VENUE

6. This is a constitutional rights action arising under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution and Georgia law. This Court has jurisdiction of federal claims under 28 U.S.C. §§ 1331 and 1343 and jurisdiction of state law claims pursuant to 28 U.S.C. § 1367.

7. Venue in this Court is proper under 28 U.S.C. § 1391 because the events giving rise to Plaintiffs' claims arose in this district and division.

## FACTUAL ALLEGATIONS

### *The Arrest Quota Policy*

8. The Atlanta Police Department has a longstanding policy requiring that its officers must meet an arrest quota or face poor reviews, discipline, and termination.

9. According to testimony from an APD Deputy Chief, the arrest quota policy has been in place since at least 2006 and continues to present day.

10. Officers' adherence to or departure from the arrest quota policy is frequently discussed in weekly meetings with the heads of each of APD's "zones" and the Deputy Chief of Field Operations.

11. The precise number of arrests required pursuant to the arrest quota policy has changed from time to time as a result of discussions in the weekly meetings and consultation with the Chief of Police.

12. The arrest quota policy involves spreadsheets that track a range of APD officer's law enforcement activities.

13. Each of a number of law enforcement activities is assigned a point value.

14. The point values assigned to each activity heavily incentivize officers to make arrests, even where an arrest is not supported by the Fourth Amendment's probable cause requirement or by the best use of officer discretion.

15. For example, an officer who responds to a call for service and decides to make an arrest will receive—at minimum—19 times as many points as an officer who responds to a call for service without making an arrest.

16. The arrest quota policy creates even higher incentives to making arrests of children.

17. For example, an officer who responds to a call for service decides to make an arrest of a child will receive—at minimum—39 times as many points as an officer who responds to a call for service without making an arrest.

18. The arrest quota policy also incentivizes officers to stack as many charges under state and local law as possible, even where a given charge is not supported by the Fourth Amendment's probable cause requirement or by the best use of officer discretion.

19. The arrest quota policy incentivizes arrests and criminal charges even where there is no basis for the arrest and criminal charges because the policy only counts what the officer's decision-making, not what is ultimately prosecuted or proven.

20. The arrest quota policy effectively requires that officers make two custodial arrests per shift—or one arrest of a child per shift.

21. The spreadsheets tracking each officer's performance on the arrest quota policy are posted on a regular basis in APD precincts.

22. On the spreadsheets, officers who do not make enough arrests to meet the arrest quota policy have their names highlighted in an act of public shaming for failing to arrest a sufficient number of citizens.

23. Officers who do not make enough arrests to meet the arrest quota policy also face poor performance evaluations, the loss of preferred assignments, promotions denied, the loss of off duty work opportunities, and escalating discipline, including termination.

24. In contrast, officers who make more arrests are praised, encouraged, and given better assignments.

### *Erik Clanton and James Douglas Unlawfully Seize Plaintiff*

25. In the afternoon of December 28, 2019, Plaintiff Robert McGhee stood on a wide median separating lanes of traffic on 17th Street at its intersection with Spring Street in Atlanta.

26. There is a prominently marked crosswalk that provides access to the median.

27. The median is specifically designed for pedestrian, and even wheelchair, access.

28. An anonymous passing motorist called 911 to report that "there's a group of kids that sell drugs on the corner of 17th and Spring. I was instructed by a detective to call police officers each and every time we see them on the corner."

29. But the anonymous passing motorist then clarified that there was no group, but rather a single "probably 14 [year old] young black boy."

30. The anonymous passing motorist did not report that he observed the child selling drugs or anything else at that time.

31. The anonymous passing motorist reported only that he believed that children sold drugs in groups in the area.

32. The anonymous passing motorist told the 911 operator that the child he observed did not appear to be armed.

33. The 911 operator then conveyed this information to Defendants Clanton and Douglas who drove to the intersection of 17th Street and Spring Street.

34. When Clanton and Douglas observed McGhee from their APD vehicle, Douglas said to Clanton about McGhee, "He ain't selling dope."

35. Clanton responded, "It doesn't matter."

36. Clanton and Douglas then worked to find any reason they could to arrest McGhee.

37. Douglas said, "I need the code section, you know. There's got to be something."

38. There was some traffic such that Clanton and Douglas could observe McGhee while waiting to pull up to where he was standing and travelling eastbound on 17th Street.

39. Douglas speculated that it must violate some Georgia law for McGhee to stand where he was standing, stating "You can't just sit right there."

40. But there was no law that prohibited McGhee from standing where he was standing.

41. Douglas speculated that there was "no way to get there," meaning the median where Plaintiff was standing.

42. Clanton similarly stated that there was no way for McGhee to get to the median without violating a pedestrian rule.

43. Clanton speculated that McGhee was violating rules with regard to "controlled access highways."

44. Neither 17th Street, not Spring Street, meets the definition of a controlled access highway under the Georgia Code.

45. Clanton and Douglas should have observed the conspicuously marked crosswalk leading to the median.

46. Clanton and Douglas argued over who would get to chase McGhee after they induced him to run by attempting to arrest him when he had not committed any offense.

47. Douglas at first said that he wanted to be the one to run after him.

48. But then Clanton said he wanted to do so.

49. Douglas again affirmed that, "There is no way that this dude is selling dope in the middle of the street."

50. Douglas also observed that McGhee did not appear to be selling water either.

51. Clanton and Douglas made a u-turn at 17th Street so that their vehicle was facing westbound immediately next to McGhee.

52. While making the u-turn, they crossed over the crosswalk that provided access to the median twice.

53. Clanton and Douglas then jumped out of the vehicle aggressively to arrest McGhee.

54. McGhee knew that Clanton and Douglas intended to arrest him and believed that they would use force against him.

55. McGhee knew from the experiences of friends and family members who had been arrested for petty offenses, including ones that they had not committed, that he was being harassed for no reason and was in danger.

### *Clanton Intentionally Uses Deadly Force*

56. To prevent his unlawful arrest, McGhee ran and Clanton chased after him on foot, while Douglas drove the vehicle.

57. McGhee ran through the parking lot at the southwest corner of 17th Street and Spring Street until he encountered the fence at the western edge of the parking lot.

58. On the parking lot side, the fence is approximately six feet tall.

59. On the other side of the fence, there is an approximately 30-foot drop to the interstate access road below.

60. McGhee did not know there was such a drop.

61. Clanton's police report provided that "Giving [sic] my knowledge of the area gained from working in Zone 5 for several years, I knew there was a long (20-30 feet) drop onto the concrete on ramp."

62. When McGhee got to the top of the fence he stopped to surrender knowing that he could not escape.

63. McGhee did not want to be injured or killed by the drop to the highway below.

64. Instead of stopping to assist McGhee, or pulling McGhee from the top of the fence onto the safe side, Clanton intentionally charged into the fence.

65. Clanton is a former professional football player.

66. Clanton played as an outside linebacker and defensive end for the National Football League's Pittsburgh Steelers and the Canadian Football League's Montreal Alouettes.

67. Clanton intentionally knocked McGhee off of the top of the fence by charging into McGhee and the fence at full speed.

68. McGhee also played football and described being tackled or "trucked" by Clanton.

69. Clanton did not slow down at all.

70. Instead, he charged into the fence with all of the force he could.

71. After Clanton's first collision with him, McGhee fell to the other side of the fence and was hanging on in a precarious position.

72. It appears that Clanton then made contact with the fence a second time to knock McGhee all the way off.

73. McGhee crashed down below and was severely injured.

74. McGhee suffered broken bones in his legs, shoulder, and face.

75. McGhee was hospitalized for several weeks as a result of his injuries.

76. McGhee has had multiple surgeries, including most recently in December 2021, to attempt to address the injuries he suffered.

77. McGhee's mother, Koronda Smith, is responsible for the significant medical bills incurred while McGhee was a minor.

***Arrest Quota Policy Caused Plaintiff's Fourth Amendment Rights to be Violated***

78. Had Clanton and Douglas responded to the call for service, observed that McGhee had done nothing wrong, and left, Clanton and Douglas would have received almost no credit under the arrest quota policy.

79. Had Clanton and Douglas permitted McGhee to avoid their unlawful seizure without arresting McGhee, they would have received no credit under the arrest quota policy.

80. Instead, by arresting McGhee and stacking a series of unsupported charges under state and local law, Clanton and Douglas were able to earn at least 131 times as many points as if they had followed the law by responding to the call for service and not taking further action against McGhee who had violated no law.

81. Had Clanton and Douglas simply responded to the call for service, they would have completed approximately 1/160th of their required weekly activity under the arrest quota policy.

82. Instead, by arresting McGhee and stacking a series of unsupported charges under state and local law, they earned almost all of their required weekly activity in one interaction.

83. The arrest quota policy incentivized Clanton and Douglas to make an unlawful arrest, to use force to effectuate that unlawful arrest, and then to fabricate additional charges without probable cause.

### *All Charges Without Even Arguable Probable Cause*

84. Clanton and Douglas charged McGhee with violating O.C.G.A. § 40-6-92 for crossing onto the median at a place other than a crosswalk.

85. But Clanton and Douglas knew there was a crosswalk to the median because they drove across the crosswalk twice before making contact with McGhee.

86. Clanton and Douglas charged McGhee with violating O.C.G.A. § 40-6-97 for soliciting "employment, business, or contributions" from drivers while "stand[ing] on a highway."

87. But Clanton and Douglas knew that McGhee was not standing on the highway and they knew McGhee was not selling drugs or water or anything else.

88. Clanton and Douglas charged McGhee with violating O.C.G.A. § 40-6-91 for violating the rules regarding pedestrians respecting the right of way.

89. But Clanton and Douglas knew that McGhee had lawfully crossed into the median, and that when he resisted their unlawful arrest, that McGhee did not enter into the path of a vehicle which was so close that it was impractical for the driver to yield.

90. No vehicle struck McGhee or came anywhere near him.

91. Clanton and Douglas charged McGhee with violating O.C.G.A. § 16-10-24 for obstruction for resisting his arrest.

92. But Clanton and Douglas knew that they were not engaged in the lawful discharge of their duties by making an arrest without probable cause and that McGhee had the right to resist an unlawful arrest.

93. Clanton and Douglas charged McGhee with violating City Ordinance 106-81(7) for "[i]nterfer[ing], by acts of physical obstruction, another's pursuit of a lawful occupation."

94. But Clanton and Douglas knew that McGhee had done no such thing because he had offered no physical obstruction of any kind and because Clanton and Douglas were not acting lawfully in arresting him without justification.

95. Clanton and Douglas charged McGhee with violating City Ordinance 106-81(11) for littering for dropping two water bottles from his pockets.

96. But Clanton and Douglas knew that McGhee did not have any water bottles in his pockets and did not discard what he did not have in any unlawful fashion.

**COUNT ONE**
*Excessive Force*
*under 42 U.S.C. § 1983 and the Fourth Amendment*
*Against Clanton and City of Atlanta*

97. The law was clearly established that law enforcement cannot use deadly force in the absence of an imminent threat to the safety of officers or others. *See, e.g.*, *Harrell v. Decatur Cty.*, 22 F. 3d 1570, 1573 (11th Cir. 1994) ("Where the suspect is not a fleeing felon and poses no immediate threat to the officer or others, the use of deadly force is a violation of the suspect's Fourth Amendment rights.").

98. The law was clearly established that law enforcement cannot use any force to effectuate an unlawful arrest, including an arrest that is unlawful for lack

of probable cause. *Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1331–32 (11th Cir. 2006).

99. Defendant Clanton used deadly force by intentionally knocking McGhee off the top of a fence down an approximately 30-foot drop when he knew that McGhee was unarmed and not posing any threat to anyone and when he knew there was a long drop down to the road below.

100. Clanton knew that McGhee was unarmed.

101. Clanton knew McGhee had not committed any crime.

102. Clanton knew that McGhee had not attempted to do violence to officers or anyone else.

103. Clanton provided no warning prior to his use of deadly force, but providing warning was feasible, had Clanton stopped or even slowed down.

104. Atlanta's arrest quota policy caused Clanton to unlawfully use force against McGhee to effectuate the arrest.

**COUNT TWO**
*Unlawful Seizure*
*under 42 U.S.C. § 1983 and the Fourth Amendment*
*Against all Defendants*

105. Defendants Clanton and Douglas knew McGhee had not committed any crime.

106. No reasonable officer in Clanton or Douglas' position could have believed that Plaintiff committed the criminal offenses charged.

107. Based upon the facts known by Clanton and Douglas, no reasonable officer could have believed that probable cause existed to arrest McGhee, and there was no arguable probable cause for his arrest.

108. As a result of Plaintiff's arrest, he suffered a loss of liberty, extensive monetary losses, reputational damages, humiliation, and emotional distress.

109. Defendants' decision to arrest McGhee proximately caused the unlawful use of force.

110. Atlanta's arrest quota policy caused Clanton and Douglas to unlawfully seize McGhee.

**COUNT THREE**
*State Law Battery*
*Against Clanton*

111. The unjustified use of force is battery under Georgia law.

112. Defendant Clanton used deadly force against McGhee without any justification for any force.

113.   Defendant Clanton is not entitled to official immunity because he acted with actual malice, that is the deliberate intention to hurt McGhee, despite knowledge that he posed no threat and had committed no crime.

## COUNT FOUR
*State Law False Arrest*
*Against Clanton and Douglas*

114.   The unjustified arrest of another without a warrant and without justification is tortious under Georgia law.

115.   Defendants Clanton and Douglas arrested McGhee without justification.

116.   Defendants Clanton and Douglas are not entitled to official immunity because they acted with actual malice, that is the deliberate intention to arrest McGhee with actual and admitted knowledge there was no basis to do so.

## COUNT FIVE
*Punitive Damages under 42 U.S.C. § 1983 and Georgia Law*
*Against Clanton and Douglas*

117.   Defendants Clanton and Douglas acted with conscious indifference, reckless disregard for the consequences of their actions, an intent to injure, and

malice such that an award of punitive damages is authorized under federal and Georgia law.

## COUNT SIX
### *Attorneys' Fees under O.C.G.A. § 13-6-11*
### *Against all Defendants*

118. Defendants acted with bad faith, stubborn litigiousness, and to cause undue delay in both the underlying incident and in forcing this litigation to move forward and, upon experience and belief, will continue to do so in the course of the litigation moving forward.

WHEREFORE, Plaintiffs demand the following:

a) That this action be tried by a jury;

b) That judgment be entered in favor of Plaintiffs and against Defendants in an amount to be determined by the enlightened conscience of fair and impartial jurors to the extent allowed by law;

c) That Plaintiffs be awarded reasonable attorneys' fees and expenses under state and federal law, including pursuant to 42 U.S.C. § 1988 and O.C.G.A. § 13-6-11;

d) That all costs of this action be taxed against Defendants; and

-19-

      e)      That the Court award any additional or alternative relief as may be deemed appropriate under the circumstances.

Respectfully submitted this 28th day of December, 2021.

                              */s/ Zack Greenamyre*
                              Zack Greenamyre
                              Georgia Bar No. 293002
                              */s/ Samantha J. Funt*
                              Samantha J. Funt
                              Georgia Bar No. 943783

Mitchell & Shapiro LLP
3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305
404-812-4747
zack@mitchellshapiro.com
sam@mitchellshapiro.com

*Counsel for Plaintiffs*